# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **RAY JUSTUS,** | ) |
| Plaintiff, | ) Case No. 1:08CV00048 |
| v. | ) **OPINION** |
| **THE JUNCTION CENTER FOR INDEPENDENT LIVING, INC.,** | ) By: James P. Jones<br>) Chief United States District Judge |
| Defendant. | ) |

*Edward G. Stout, Curcio & Stout, PC, Bristol, Virginia, for Plaintiff; Henry S. Keuling-Stout, Keuling-Stout, P.C., Big Stone Gap, Virginia, for Defendant.*

In this employment discrimination case brought pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West 2008) ("the Act"), the defendant has moved for summary judgment. For the reasons that follow, the motion will be granted.

I

On November 12, 2008, the plaintiff Ray Justus filed the instant suit in which he claims that he was terminated by his employer, the defendant, The Junction Center for Independent Living, Inc. ("Junction Center"), in violation of the Act because he is blind. Junction Center filed a motion for summary judgment pursuant to Federal

Rule of Civil Procedure 56(b) on September 26, 2009. Jurisdiction is vested in this court pursuant to 28 U.S.C.A. § 1331 (West 2006). The parties have briefed the issues, oral argument was presented, and the motion is now ripe for decision. The facts, either uncontradicted or viewed in the light most favorable to Justus as the non-moving party,[1] are as follows:

Junction Center is a member of a statewide network of private non-profit independent living centers that are funded in part by the federal and state governments.[2] Justus began working for Junction Center as a peer counselor to others with disabilities in September 1999. In 2002, Justus became Junction Center's Community Action Specialist ("CAS"), a position created by the 2002-2004 State Plan for Independent Living (the "State Plan"). Every three years the Virginia Statewide Independent Living Council (the "Statewide Council") and its state agency partners develop a new State Plan as required by federal law. *See* 29 U.S.C.A. § 796c (West 2008). The State Plan sets out goals for the independent living centers across

---

[1] In evaluating a motion for summary judgment, "a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *Earley v. Marion*, 540 F. Supp. 2d 680, 684 (W.D. Va. 2008), aff'd, No. 08-1391, 2009 WL 2353255 (4th Cir. July 28, 2009) (unpublished).

[2] Junction Center's mission "is to assist people who have significant disabilities to live independently in the least restrictive and most integrated environment possible." Junction Center for Independent Living, Inc., http://www.junctioncenter.org (last visited December 9, 2009).

Virginia and importantly, determines how the state of Virginia will distribute federal monies allocated under the Act to Virginia's independent living centers (commonly referred to as "Part B funds"). Both the 2002-2004 and 2005-2007 State Plans allocated Part B funds to pay for CASs' salaries at the various independent living centers across the state.

When writing the new 2008-2010 State Plan however, the Statewide Council and its partners changed course and proposed to devote the Part B funds to another initiative, leaving the centers with no federal funding for the CASs' salaries. The proposed 2008-2010 State Plan was made available for public comment in April 2007 and was set to go into effect October 1, 2007, the first day of fiscal year 2008. However, disputes among the Statewide Council and its partners delayed the final approval of the plan, and the State Plan was not approved until on or about November 15, 2007. In the end, the 2008-2010 State Plan did discontinue funding for the CAS program.

Justus was aware in May 2007 that the new State Plan called for the end of the CAS program—and consequently, his position at Junction Center. In a note to Junction Center's executive director, Dennis Horton, dated May 4, 2007, Justus wrote, "Dennis, Maureen Hollowell asked all of the CAS[s] to talk with our Directors to see what they wanted the CAS[s] to work on regarding the Statewide SILC Plan.

And to ask our directors what our positions will be when the CAS project ends?" (Mot. Summ. J., Ex. F.) Justus suggested he could work as a peer counselor. Junction Center had hired its last peer counselor in the fall of 2006. According to Justus, before hiring the new counselor, Junction Center never internally posted the opening as required by its policies and procedures. The position was advertised in the local newspaper for three days in August 2006, however.

On November 20, 2007, Junction Center notified Justus that "[s]ince [Junction Center] does not have the budget to continue your position, your status will be on layoff until such time as a suitable position that would be able to utilize your skills and talents would open up. . . . [H]opefully, something will soon open up that will fit your interests and skills." (Mot. Summ. J., Ex. G.) The effective date of the layoff was December 12, 2007. On January 16, 2008, Horton emailed Justus again, this time to inform him that Junction Center intended to hire a new peer counselor: "If you would be interested in applying, Junction Center would welcome your application. I have discussed this with Roger and would like to set up a conference call among us if you would like either tomorrow or Friday." (Mot. Summ. J., Ex. I.) Justus applied and was interviewed for the position on April 29, 2008. Interviewing was suspended, however, after Junction Center realized the state of Virginia was not going to fund the position. Justus was never rehired by Junction Center.

And to ask our directors what our positions will be when the CAS project ends?" (Mot. Summ. J., Ex. F.) Justus suggested he could work as a peer counselor. Junction Center had hired its last peer counselor in the fall of 2006. According to Justus, before hiring the new counselor, Junction Center never internally posted the opening as required by its policies and procedures. The position was advertised in the local newspaper for three days in August 2006, however.

On November 20, 2007, Junction Center notified Justus that "[s]ince [Junction Center] does not have the budget to continue your position, your status will be on layoff until such time as a suitable position that would be able to utilize your skills and talents would open up. . . . [H]opefully, something will soon open up that will fit your interests and skills." (Mot. Summ. J., Ex. G.) The effective date of the layoff was December 12, 2007. On January 16, 2008, Horton emailed Justus again, this time to inform him that Junction Center intended to hire a new peer counselor: "If you would be interested in applying, Junction Center would welcome your application. I have discussed this with Roger and would like to set up a conference call among us if you would like either tomorrow or Friday." (Mot. Summ. J., Ex. I.) Justus applied and was interviewed for the position on April 29, 2008. Interviewing was suspended, however, after Junction Center realized the state of Virginia was not going to fund the position. Justus was never rehired by Junction Center.

II

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). That is, summary judgment should be awarded "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Earley*, 540 F. Supp. 2d at 684 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). It "is not 'a disfavored procedural shortcut,' but an important mechanism for weeding out 'claims and defenses [that] have no factual basis.'" *Earley*, 540 F. Supp. 2d at 684 (quoting *Celotex*, 477 U.S. at 327).

"[T]he ultimate burden of demonstrating a genuine issue of material fact for trial" is on the *non*-moving party. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). And the non-moving party cannot rely on speculative allegations or "conclusory statements, without specific evidentiary support" to satisfy this burden. *See Causey v. Balog*, 162 F.3d 795, 801-02 (4th Cir. 1998). Evidence must be probative and concrete to demonstrate an genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Junction Center argues that summary judgment is appropriate in this case because Justus has not shown he can establish a prima facie case of discrimination on the basis of disability. Under § 504 of the Act, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C.A. § 794(a) (West 2008).

To make out a prima facie case of discriminatory termination, Justus must prove that (1) he has a disability; (2) he is otherwise qualified to perform the job; (3) he was terminated solely because of his disability;[3] and (4) the program or activity receives federal funds. *See Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003); *Baird*, 192 F.3d at 467-69.

---

[3] Justus asserts that he only has to show that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. However, that is the causation test for a claim under the American with Disabilities Act (the "ADA"), not the Rehabilitation Act. *Compare Benson v. E.I. Du Pont De Nemours & Co.*, 182 F. Supp. 2d 527, 530-31 (W.D. Va. 2002), *with Betts v. Rector & Visitors of Univ. of Va.*, 198 F. Supp. 2d 787, 798 (W.D. Va. 2002). Although generally the same legal standards apply to these two acts, the language of the Rehabilitation Act requires courts to apply a causation test to § 504 claims that is significantly stricter than the test applied to ADA claims. *See Baird v. Rose*, 192 F.3d 462, 467-69 (4th Cir. 1999); *Betts*, 198 F. Supp. 2d at 798.

Junction Center concedes that Justus meets elements one and two, and Junction Center is federally funded, therefore the fourth element is also established.[4] Thus, the only issue remaining is whether Justus has demonstrated that a question of fact exists as to whether he was terminated solely because of his disability. I find that he has not.

Justus concedes that the federal funding for his position ran out in the fall of 2007. He nevertheless argues that Junction Center should have offered him the peer counseling position filled by someone else in fall of 2006 or "absorbed" him, i.e., paid for his employment with other funds. However, Justus's assertions fall short of demonstrating he was discharged *solely* because of his disability. The loss of the Part B funding is the direct cause of his termination—if the 2008-2010 State Plan had continued to fund CAS positions, Justus would still be employed.

---

[4] Junction Center and other independent living centers were created by an amendment to the Act. *See* Rehabilitation Act Amendments of 1998, Pub L. No. 105-220, sec. 410, §§ 701-753, 112 Stat. 1092, 1217-41 (codified at 29 U.S.C.A. §§ 796-796l. (West 2008)); *Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F. Supp. 2d 553, 557 (E.D. Pa. 2007). Because of that, Junction Center has a federally mandated purpose and structure and receives Part B as well as other federal funds. *See* 29 U.S.C.A. §§ 796-796k. (West 2008); *Liberty Res.*, 528 F. Supp. 2d at 557-58. Because some of Junction Center's programs and activities do rely on federal assistance, this is enough to qualify all the operations of Junction Center as a "program or activity that receives federal assistance." *See* 29 U.S.C.A. § 794(b) (West 2008) ("the term 'program or activity' means all of the operations of . . . [a private organization] which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation . . . any part of which is extended Federal financial assistance."); *see also DeVargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1384 (10th Cir. 1990).

Justus claims that Junction Center could have avoided his termination by offering him the peer counseling position that became available in the fall of 2006. Justus asserts that Junction Center knew or should have known that the CAS position funding would be discontinued then, but he presents no evidence to support this contention. To the contrary, Justus concedes that he did not know when the peer counseling position opened up that funding for the CAS position would be discontinued. Also, nothing in the record demonstrates Junction Center was privy to the 2008-2010 State Plan prior to April 2007 when the proposal to allocate the Part B funding to a new initiative and end the CAS program was made public.

Regardless, Justus asserted at oral argument that Junction Center should have terminated the woman hired as a peer counselor in 2006 and given him the position as the more senior employee, rather than terminate him. However, the Act does not demand employers reassign an employee with a disability to a position that is already filled. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996). Additionally, Justus provides no evidence that such a reassignment was ever performed for any other Junction Center employee. Therefore, Junction Center's failure to do so for Justus cannot be considered discrimination. *See Alexander v. Choate*, 469 U.S. 287, 300, 304 (1985) (finding that § 504 requires "evenhanded

treatment" for individuals with disabilities, not "fundamental alteration[s] in the nature of a program" (internal quotes omitted)) .

Justus's argument that he should have been "absorbed" by Junction Center is also unconvincing. Under the Act, "employers are not required to create new positions for disabled employees." *Monette*, 90 F.3d at 1187. Moreover, Junction Center's decision not to create its own, internally funded CAS position was in line with its previous practice. Justus names only one employee, Shirley Peters, who he claims was previously "absorbed." Peters, who was over sixty-five and did not have a disability, was a trainee at Junction Center. Her training was paid for by a sponsor as part of the Older Americans Act, Senior Community Services Employment Program. After she was fully trained, Junction Center hired her. Unlike Justus's funding, the purpose of Peters's grant was to train her for a position that Junction Center would need her to perform after the training period ended. Most importantly, Junction Center had funds to pay for her salary. The uncontradicted evidence shows that at the time Justus was discharged Junction Center did "not have the budget to continue [Justus's] position." (Mot. Summ. J., Ex. G.)

Furthermore, the record shows that Junction Center did everything in its power to prevent it from having to terminate Justus. During the period in October and November when there was still a chance that the new State Plan would not be

approved, Junction Center continued to employ Justus even though the program technically ended in September. Once the 2008-2010 State Plan was approved and the CAS program officially ended, Junction Center only put Justus on "layoff" in the hopes that they could find a new position within Junction Center. Indeed, Junction Center alerted him approximately one month after he was discharged of a possible peer counseling position and actively encouraged him to apply. Junction Center's director told Justus that Junction Center would "welcome his application." (Mot. Summ. J., Ex. I.) Therefore, the claim that Junction Center would have not terminated Justus but for his disability is simply unsupported by any probative evidence.

Accordingly, I find that Justus has failed to establish a prima facie case of discrimination, and I award summary judgment to Junction Center.

III

For the foregoing reasons, the defendant's Motion for Summary Judgment is granted. A Judgment consistent with this Opinion will issue forthwith.

DATED: December 15, 2009

/s/ JAMES P. JONES
Chief United States District Judge